# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

Residents First, LLC,

      Debtor.

_____/

Case No. 23-49817-mar
Chapter 11
Hon. Mark A. Randon

### OBJECTION TO DEBTOR RESIDENTS FIRST, LLC'S
### CHAPTER 11, SUBCHAPTER V PLAN OF REORGANIZATION

Champion Home Builders, Inc. ("CHB"), through its undersigned counsel, states as follows in support of its Objection to Debtor Residents First, LLC's Chapter 11, Subchapter V Plan of Reorganization ("Objection"):

### BACKGROUND

**A. The Property Management Agreement between Debtor and Founding Partners, LLC.**

1.      Debtor, Residents First, LLC ("Debtor") was formed in 2010 for the purpose of performing property management services for manufactured home communities for Founding Partners, LLC ("FP"). FP directly or indirectly owns five manufactured home park communities (the "Communities") including communities described as Kingsbrook Estates ("Kingsbrook") and Twin Pines ("Twin Pines").

**Exhibit 1**, *Examination Transcript of Ara Darakjian*, dated February 6, 2024, page 28.

2.      Ara Darakjian ("Mr. Darakjian") is the sole manager of Debtor, and he

is also the sole manager of FP. Mr. Darakjian's trust is the sole member of TIR Equities, LLC ("TIR Equities") which is the sole member of Debtor. **Exhibit 1**, page 45. TIR Equities and Mr. Darakjian's brother and mother are the only members of FP. **Id.**

3.        FP pays Debtor a monthly fee for its property management services and is intended to operate as a break-even operation. **Exhibit 1**, page 53.

4.        According to Debtor's *Schedule G* [Doc 29], Debtor does not perform property management services for any entities other than FP. Nonetheless, Debtor has provided accounting services to other entities owned or controlled by Mr. Darakjian or by Mr. Darakjian's brother and mother, each of which is an insider or affiliate of Debtor, as those terms are defined in sections 101(2) and (31) of the Bankruptcy Code ("Related Entities").[1]

5.        On January 1, 2022, Debtor entered into a written Property Management Agreement with FP (the "Property Management Agreement"). (**Exhibit 2**, *Property Management Agreement,* dated January 1, 2022). The Property Management Agreement was amended to change the payment terms between FP and Debtor which was required by a lender to FP. **Exhibit 1**, page 37-38.

6.        Mr. Darakjian signed the Property Management Agreement on behalf

---

[1] According to Mr. Darakjian's testimony, Debtor has provided accounting services to Darakjian Jewelers, TIR Equities, LLC, TIR Capital, LLC, Reliance Management, Reliance Home Services and Residential Construction Group.

of FP as FP's managing member and he also signed the Property Management Agreement on behalf of Debtor as Debtor's managing member.

7. Pursuant to section 2.02 and Exhibit B of the Property Management Agreement, FP agreed to pay Debtor a fee equal to 3.5% of the income for each of the Communities plus all of Debtor's out of pocket costs and expenses incurred for the management of the Communities (the "Fees"). Section 2.02 permitted Debtor to deduct the Fees from each of the Communities' operating accounts at the end of each month. **Exhibit 2**.

8. Section 2.05 of the Property Management Agreement requires that Debtor, as Manager, engage all independent contractors, suppliers and vendors in FP's name and all expenses incurred are to be paid from each of the Communities' operating accounts. Likewise, Section 2.09 of the Property Management Agreement required Debtor to pay operating expenses from each of the Communities' operating accounts. **Exhibit 2**.

9. According to Section 5.02 of the Property Management Agreement, FP agreed to indemnify Debtor for expenses incurred in connection with the management and maintenance of the Communities. It says:

> Owner shall indemnify, defend and save Manager, its directors, officers, employees, agents, representatives, successors and assigns ("Manager's Indemnitees") harmless from and against any and all liability, claim, demand, loss, cost, damage, expense or cause of action (including without limitation, reasonable attorneys' fees and expenses and costs of litigation) suffered by

or asserted against any of Manager's Indemnitees arising out of the performance or non-performance of Manager's duties and activities within the scope of this Agreement or arising from any action or activity on, or the condition of, the Properties, except if and to the extent arising out of the gross negligence, willful misconduct or fraud of any of the Manager's Indemnitees. Manager shall not be liable for any good faith error of judgment or for any mistake of fact or law, or for anything which it may do or refrain from doing in good faith and in pursuance of its duties and activities hereunder.

**Exhibit 2.**

10.     The Property Management Agreement provides that the contract may be terminated only for cause. Cause for termination is defined to include (a) material breach of the Property Management Agreement by either Debtor or FP; (b) Debtor's gross negligence; (c) insolvency of either Debtor or FP; or (d) a material change in ownership of FP. **Exhibit 2**.

**B. Debtor's Contract with Creditor, CHB for manufactured home installation services.**

11.     On March 13, 2021, Debtor contracted with CHB for the installation of manufactured homes at the location of Kingsbrook and Twin Pines Communities (the "Installation Services") and CHB performed the Installation Services at Kingsbrook and Twin Pines throughout 2021. The manufactured homes to be installed by CHB are owned by another Debtor affiliate, Reliance Home Services ("RHS") which is 100% owned by Mr. Darakjian. **Exhibit 1**, page 21. Therefore, the benefit of the manufactured home installations directly benefitted FP, as property

owner and RHS as the manufactured home owner.

12.     CHB invoiced Debtor throughout 2021 as each phase of the Installation Services was completed. Debtor failed to pay amounts due to CHB for the Installation Services and owed CHB a balance of $599,924.00 as of December 2021.

13.     As a result of Debtor's nonpayment, on February 18, 2022, CHB filed a complaint (the "Complaint") against Debtor for all outstanding charges due and owing from Debtor for the installation services.

14.     Debtor and CHB arbitrated the Complaint before the American Arbitration Association and on April 11, 2023, the arbitration panel awarded CHB the amount of $478,864.90 for the Installation Services (the "Arbitration Award") No award was granted to Debtor. **Exhibit 3** "Arbitration Award." The Arbitration Award is a final adjudication.

**C. CHB and the Trustee's investigation of Debtor's financial affairs.**

15.     Several months following the date of the Arbitration Award, Debtor filed its voluntary bankruptcy petition under chapter 11, subchapter V of title 11 of the United States Code (the "Bankruptcy Code") on November 8, 2023 (the "Petition Date").

16.     Deborah Fish was appointed as Debtor's subchapter V trustee pursuant to the Bankruptcy Code and the court's notice of appointment of the subchapter V trustee [Doc 9] (the "Trustee").

17.     Following the Petition Date, on November 17, 2023, CHB timely filed its proof of claim in Debtor's above captioned bankruptcy proceeding in the amount of the Arbitration Award [Claim No. 3-1].

18.     On December 18, 2023, the court entered an order granting the Trustee authority to conduct an investigation of Debtor's financial affairs [Doc 50] (the "Expanded Powers Order").

19.     The Trustee has conducted an extensive investigation of Debtor's financial affairs pursuant to the Expanded Powers Order and Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004"). As of the filing of this objection, that investigation is still ongoing and CHB has continued to participate in the Trustee's investigation of Debtor's financial affairs pursuant to Rule 2004.

20.     Thus far, Mr. Darakjian, on Debtor's behalf, produced substantial, though, so far, incomplete, records and data regarding Debtor's financial affairs.

21.     According to Debtor's financial records produced to date, during at least the two years prior to the Petition Date, Debtor engaged in several financial transactions with Related Entities.[2]

22.     Debtor's books and records produced to date indicate that, at a

---

[2] Within the two years prior to the Petition Date, the transfers involved the following Related Entities: Darakjian Jewelers, TIR Capital LLC, Reliance Management, Reliance Home Services, Residential Construction Group and transfers by debtor to the Communities, namely, Keego Harbor, Tallmadge Meadows, and Crystal Downs.

minimum, there are more than $200,000.00 in transfers by Debtor to Related Entities that occurred within two years prior to the Petition Date. CHB is still investigating Debtor's financial transactions that occurred more than two years before the Petition Date ("Related Entity Transfers").

23. According to Mr. Darakjian's Rule 2004 testimony and Debtor's records, Debtor failed to maintain any formalities between it and Related Entities regarding the transactions. For example, according to Mr. Darakjian, the various financial transactions between Debtor and Related Entities were either loan repayments between Detor and Related Entities or were payments to Debtor for providing accounting services to Related Entities. **Exhibit 4,** March 21, 2024 *Examination Transcript of Ara Darakjian*, dated March 21, 2024, pages 9, 24. However, Mr. Darakjian testified that there are no written agreements between Debtor and Related Entities regarding loan transactions or accounting services, Debtor does not maintain ledgers to identify transactions between Debtor and Related Entities and Mr. Darakjian was unable to testify as to the exact purpose of most all of the transactions between Debtor and Related Entities. **Exhibit 1,** pages, 42, 83, 84, 86, 87-88, 93, 94, 96, 97, 98, 99; **Exhibit 4,** pages, 24, 37, 38, 46, 48-49, 69.

24. CHB also discovered that, despite the terms of the Property Management Agreement, Debtor and FP have not maintained the formalities of the

Property Management Agreement.

25.    In particular, Debtor agreed to present FP annual reports for management of the Communities. Nonetheless, according to Mr. Darakjian's Rule 2004 testimony, and Debtor's records, no such annual reports have been prepared for the last 4 to 5 years. **Exhibit 1**, page 16; **Exhibit 2**, page 3, Section 2.03.

26.    Moreover, the Property Management Agreement requires FP to pay all costs incurred in connection with management of the Communities and to indemnify Debtor for all claims in connection with Debtor's management of the Communities and "arising out of the performance or non-performance of Manager's duties." **Exhibit 1**, page 12, Section 5.02. Notwithstanding, the investigation of Debtor's financial affairs has revealed that FP has failed or refused to pay all expenses incurred for Debtor's management of the Communities, in particular, FP has failed to contribute to or indemnify debtor for the Installation Services performed by CHB and the resulting Arbitration Award. This, of course, was based on Debtor never having made demand, as required under the Property Management Agreement, upon FP, either under the contractual reimbursement provision or under the indemnity obligation.

## DEBTOR'S PLAN

27.    Debtor filed its amended Chapter 11, Subchapter V Plan on March 7, 2024 (the "Plan").

28.     Pursuant to the Plan, Debtor proposes, in pertinent part to enter into a Support Agreement with FP that purports to amend the terms of the Property Management Agreement.

29.     According to the Plan and the Support Agreement, if the Plan is confirmed, FP will agree to ensure Debtor has sufficient funds to (a) fund its operations; (b) fund all secured obligations due under the Pan; (c) pay Debtor's ordinary course lease obligations; (d) pay all administrative expenses and professional fees of Debtor's counsel and the Trustee; (e) pay all allowed priority claims; and (f) to allow debtor to make a minimum distribution of $15,000 per year over three years ($45,000 total) for payment of Class II, general unsecured creditors which includes CHB (the "Unsecured Creditor Dividend").

30.     The Support Agreement materially amends the Property Management Agreement[3] in the following ways:

    a.  It changes the terms of indemnification by FP to Debtor by providing that FP will not be required to pay any amounts due in connection with the investigation or litigation of claims against FP

---

[3] As noted, the Property Management Agreement may only be terminated for defined causes, such as fraud or a bankruptcy filing. The bankruptcy filing trigger is prohibited under Section 365 of the Bankruptcy Code. Without a basis for termination, the proposed amendment is illusory and, in any event, would require Court approval, for which no approval has been sought.

(a waiver of a substantial right and claim of Debtor against FP) **Exhibit 5**, Support of Debtor's Operations During the Case, page 2.

b. It creates a right of setoff by FP against Debtor for amounts FP has advanced at any time before or after the adoption of the Support Agreement (an additional waiver of a substantial right and claim of Debtor against FP). **Exhibit 5**, Repayment of Owner, page 2.

c. It grants FP a for-cause a right of termination in the event that the Trustee or an assignee of the Trustee initiates a cause of action "on behalf of the Debtor, whether derivatively or otherwise . . . ." against Related Entities including FP (a form of "deathtrap" disfavored by many courts[4]). **Exhibit 5**, Termination of the PMA, page 2.

d. It grants FP a for-cause right of termination in the event of a change of Debtor's ownership (a second "deathtrap" especially if deemed applicable to a trustee appointment). **Exhibit 5**, Termination of the PMA, page 3.

---

[4] In most cases, deathtrap plan provisions have only been allowed when they incentivize classes of claims who otherwise were not entitled to a distribution to vote in favor of a plan in exchange for value. *In re Adelphia Communs. Corp.*, 368 B.R. 140, 275 (Bankr. S.D.N.Y. 2007). In contrast, Debtor proposes a deathtrap to provide Class II Creditors *less* than they are entitled to if the Trustee pursues causes of action against FP and Related Entities.

e. It releases FP from payment obligations under the Support Agreement and the Property Management Agreement in the event that the Property Management Agreement is terminated for cause under the original terms of the Property Management Agreement and as amended by the Support Agreement (a third "death trap").

**Exhibit 5**, Termination of the PMA, page 3.

31.     According to Debtor's liquidation analysis contained in the Plan (the "Liquidation Analysis") Debtor valued its accounts receivable at $461.00. Plan, Exhibit B.

32.     The Plan provides that if Debtor confirms the Plan pursuant to section 1191(a) of the Bankruptcy Code, Debtor will waive its claims against FP and Related Entities ("Third-Party Releases") in exchange for the Support Agreement.

33.     The Plan provides that if confirmation is granted under 1191(b) of the Bankruptcy Code the Subchapter V Trustee may pursue causes of action… however, the Plan indicates that, pursuant to the Support Agreement:

> ….if Founding Partners or any of the FP Affiliates are subject to a Related Party Action, Founding Partners may terminate the Property Management Agreement and the Support Agreement for Cause. Further, Founding Partners shall in no event be required to fund any Related Party Action or any investigation into or preparation of any Related Party Action.

## CHB'S OBJECTION TO DEBTOR'S PLAN

34.     CHB objects to confirmation of the Plan for the following reasons:[5] (1) Debtor has failed to propose the Plan in good faith pursuant to section 1129(a)(3) of the Bankruptcy Code, (2) Debtor has failed to propose a plan that will provide a distribution to Class II Creditors in at least the amount Class II Creditors would receive if Debtor were liquidated under chapter 7 of the Bankruptcy Code, a requirement of section 1129(a)(7) of the Bankruptcy Code, and (3) the Plan fails to comply with applicable provisions of the Bankruptcy Code, a requirement of section 1129(a)(1) of the Bankruptcy Code, because the Plan functions as an improper release of claims against FP and Related Entities.

35.     CHB voted to reject the Plan and its claim exceeds 50 percent of the total of Class II claims. Therefore, Class II has rejected the Plan pursuant to section 1126(c) of the Bankruptcy Code. **Exhibit 6**, "CHB Ballot." As a result of Class II's rejection of the Plan, Debtor's plan does not meet the requirements for confirmation under section 1191(a) of the Bankruptcy Code. Therefore, Debtor may only seek confirmation under section 1191(b) of the Bankruptcy Code.

36.     In order to confirm a plan under section 1191(b) of the Bankruptcy

---

[5] In addition to failing to meet the applicable requirements of section 1129(a) of the Bankruptcy Code, there is no record of whether Debtor has served the Plan and ballot on all creditors and parties in interest, a deficiency that supports a denial of confirmation of the Plan for procedural reasons.

Code, Debtor's plan must conform with section 1129(a) of the Bankruptcy Code with the exception of subsections (8), (10) and (15).

**A. The Plan cannot be confirmed because it fails to meet the good faith requirements of section 1129(a)(3) of the Bankruptcy Code.**

37.     "Although the Bankruptcy Code does not define the term 'good faith,' the Sixth Circuit has held that '§ 1129(a)(3) expressly requires an inquiry into the debtor's motives in proposing the plan ....'" *In re Lapeer Aviation, Inc.*, No. 21-31500, 2022 Bankr. LEXIS 2905, (Bankr. E.D. Mich. Oct. 12, 2022) (denying confirmation of a subchapter V plan of reorganization for failure to meet the good faith requirements and best interests of creditors test of section 1129 of the Bankruptcy Code, citing *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 518 (Bankr. S.D. Ohio 2021) citing *Village Green I, GP v. Fed. Nat'l Mortg. Ass'n (In re Village Green I, GP)*, 811 F.3d 816, 819 (6th Cir. 2016)).

38.     Debtor's plan proponent, Mr. Darakjian is the sole manager of FP and most all of Related Entities as well as Debtor (through his trust, TIR Equities and TIR Capital) and he is improperly using Debtor, the Plan and the Support Agreement to shield FP and Related Entities from their obligations in connection with the Communities and the Property Management Agreement.

39.     Moreover, Mr. Darakjian has complete control over the fate of the Property Management Agreement (Debtor's most valuable asset), and he has decided to exercise that control to the detriment of Debtor's creditors, in particular,

to the detriment of CHB.

40.    CHB performed the Installation Services for Debtor on FP's behalf. The Installation Services were necessary costs in connection with Debtor's management of the Communities. Therefore, FP directly benefited from the Installation Services, and Debtor is indebted to CHB pursuant to the final Arbitration Award granted to CHB for those services.[6]

41.    According to the Property Management Agreement, FP agreed to pay all of Debtor's costs in connection with property management services, moreover FP agreed to indemnify Debtor for its "performance or non-performance" of management services within the scope of the Property Management Agreement. **Exhibit 2**, Sections 2.02, 2.04, 2.06, 2.09 and 5.02.

42.    The Installation Services and the resulting Arbitration Award relate to Debtor's management of the Communities that FP owns. Therefore, Debtor is entitled to reimbursement and indemnification by FP for the Arbitration Award. Debtor's right of reimbursement and indemnification is property of Debtor's

---

[6] Debtor asserts that it cannot impose the Arbitration Award upon FP, because FP and Debtor each dispute the benefit of the services provided by CHB (predominately claims that the work of CHB had to be "cured" by other subsequent contractors). That train has left the station. The same protestations that Debtor uses to argue no reimbursement or indemnity claim can be asserted against FP were the same protestations made in defense of the CHB claims in the arbitration and were flatly rejected by the arbitrator. Further, the reimbursement and indemnification provisions are absolute. Once a claim against Debtor was finally determined, the duty to reimburse and indemnify for the full amount became absolute.

bankruptcy estate. Nonetheless, the Plan proposes to shield FP from its duty to indemnify Debtor in connection with the Arbitration Award by granting FP the right to terminate the Property Management Agreement, if the Trustee pursues causes of action against FP. Moreover, the Support Agreement and the Plan propose to grant FP a right of setoff for all amounts it has advanced before and after the Petition Date, a right that it did not have prior to the Petition Date, which has not been properly asserted in this current proceeding and is now time barred. Each of these Plan terms are aimed to benefit FP and Related Entities, at the expense of Debtor's estate.

43.     Moreover, the Related Entity Transfers may be recoverable under chapter 5 of the Bankruptcy Code ("Related Entity Chapter 5 Claims"); however, if the Trustee pursues Related Entity Chapter 5 Claims, the Support Agreement permits FP to terminate the Support Agreement and the Property Management Agreement. This is another provision designed to shield FP and Related Entities from claims that are property of Debtor's bankruptcy estate.

44.     Confirmation of the Plan should be denied, the Plan was not proposed in good faith where it is being used as a tool by the non-debtors FP and Related Entities, to improperly shield FP and Related Entities from their liabilities owed to Debtor.

**B. The Plan cannot be confirmed since it fails to propose a distribution to Class II Creditors in an amount that Class II Creditors would receive if Debtor were liquidated under chapter 7 of the Bankruptcy Code, a requirement for confirmation pursuant to section 1129(a)(7) of the Bankruptcy Code.**

45.     The Plan does not propose a distribution to Class II Creditors in an amount Class II Creditors would receive under chapter 7 of the Bankruptcy Code, a requirement under section 1129(a)(7) of the Bankruptcy Code commonly referred to as the "best-interests-of-creditors test." Section 1129(a)(7) of the Bankruptcy Code "requires that each impaired class of creditors either unanimously accept the plan or each creditor or interest holder receive under the plan at least what such holder would receive under a chapter 7 liquidation." *Id.* (citing *Trenton Ridge*, 461 B.R. at 474).

46.     "The Court must assume that a Chapter 7 trustee will properly exercise his or her fiduciary duties," and the "'best-interests-of-creditors test' requires" a plan to assume that "valuable claims would be pursued by a chapter 7 Trustee." *Id.*

47.     The Plan fails to meet the best interests of creditors test. Debtor only disclosed accounts receivable of $461.00 and did not contain any analysis of its other claims and causes of action it held, including (a) contractual and indemnification rights, or an unjust enrichment claim against FP in connection with the Arbitration Award, a value of $478,864.90[7] to Debtor; (b) an unjust enrichment claim against

---

[7] The value of Debtor's indemnification rights against FP may be worth more than CHB's claim since Debtor also listed a claim of over $48,000 to Capital One in

FP or its subsidiaries, who own each of the Communities, and RHS, which owns the manufactured homes placed, for work provided by CHB; (c) Related Entity Chapter 5 Claims which include more than $200,000 in transfers in just the two years preceding the Petition Date alone[8]; (d) fraudulent conveyance claims against Related Entities for accounting services which Debtor admittedly has provided for years to Related Entities and for which no payment was ever sought or made, **Exhibit 1,** page 110; (e) breach of fiduciary duty claims Debtor has against Mr. Darakjian related to matters uncovered during this proceeding, in particular, due to Mr. Darakjian's failure to enforce Debtor's claims against FP, the entities who own each of the Communities and RHS, all of whom are owned and controlled by Mr. Darakjian; (f) claims for alter-ego against FP and Related Entities, which would require that FP and Related Entities answer for the liabilities owed by Debtor to its creditors; and (g) potential claims for fraud on the Court, in presenting Debtor's Schedules and Statement of Financial Affairs without reference to any of the items enumerated above, and for which Debtor had ample time to address through amendments to such documents or its Plan.

---

connection with a credit card that was used to fund expenses for the Communities that Debtor likewise did not account for in the Plan and the Liquidation Analysis.

[8] CHB and the Trustee are still investigating Debtor's transfers that occurred in the six years preceding the Petition Date that may be recoverable pursuant to section 544 of the Bankruptcy Code under the Michigan Uniform Voidable Transactions Act at M.C.L. §566.31 *et seq* which has a six-year statute of limitations.

48.     The Plan only proposes to pay costs that FP is already obligated to pay under the Property Management Agreement and seeks to discount FP's duty of indemnification to Debtor. Moreover, the Plan describes the Unsecured Creditor Dividend as the "minimum distribution" nonetheless, Mr. Darakjian testified that, under his business model, his intent is to operate Debtor as a break-even operation, therefore there is very little likelihood that unsecured creditors will receive more than the minimum distribution proposed.

49.     The Plan cannot be confirmed because it fails the best interest of creditors test due to its failure to account for a hypothetical chapter 7 trustee's right to recovery of claims against FP and Related Entities.

**C. The Plan proposes an impermissible claims release against FP and Related Entities, therefore the Plan does not comply with applicable provisions of the Bankruptcy Code.**

50.     CHB objects to the Plan for failure to comply with applicable provisions of the Bankruptcy Code required pursuant to section 1129(a)(1) of the Bankruptcy Code. The Plan and the Support Agreement propose an impermissible release of claims against Related Entities including FP.

51.     The Plan and the Support Agreement propose to release Debtor's claims against FP and Related Entities by providing terms for FP to terminate all of its payment obligations to Debtor (under the Property Management Agreement and the Support Agreement) should the Trustee or an assignee of Trustee sue FP or

Related Entities for the benefit of Debtor's estate. Moreover, the Plan and Support Agreement propose to grant FP a right of set off that did not exist prior to the Petition Date and is now time barred. Read together, these provisions functionally create a release of FP and Related Entities that is not permitted under the Bankruptcy Code.[9]

52.     The Plan and Support Agreement provisions are similar to a third-party release or injunction which are only authorized under the Bankruptcy Code in limited or "unusual circumstances." If the appropriate circumstances exist in a particular case to justify their use, such releases need to meet a specific set of criteria. *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 658 (6th Cir. 2002) (citing *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992); *In Re A.H. Robins Co.*, 880 F.2d at 702; *MacArthur v. Johns-Manville, Corp.*, 837 F.2d 89, 93-94 (2nd Cir. 1988); also see *Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC)*, 728 F.3d 567, 576 (6th Cir. 2013)).

53.     In *Dow Corning*, the Sixth Circuit adopted a seven-factor test to determine whether third-party releases are permissible under a chapter 11 plan. The seven factors to be considered are whether:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or

[9] Independent voting for such a release is also absent, a requirement under controlling law. *See* cases *infra.*

will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class, or classes, has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.* (citing *In re A.H. Robins*, 880 F.2d at 701-702; *Johns-Manville*, 837 F.2d at 92-94; *In re Continental Airlines*, 203 F.3d at 214); also see *Purdue Pharma, L.P. v. City of Grande Prairie* (*In re Pharma L.P.*), 69 F.4th 45, 78-79 (2d Cir. 2023) pending (cert. granted, opinion pending); also see *In re Hal Luftig Company, Inc.* Case No. 24cv166 (SDNY 2024) (**Exhibit 7**), where the district court adopted the seven-factor test set forth by *Dow Corning* for third-party releases in a chapter 11 subchapter V bankruptcy matter and denied confirmation of the plan).

54.     In this matter, the Plan fails to meet the *Dow Corning* factors. First, the identity of interests and the indemnification between Debtor and FP is an inverse of what *Dow Corning* contemplated. *Dow Corning* considered whether a *debtor* had a duty to defend a related third-party entity. In contrast, under the existing Property Management Agreement, *FP* has a duty to indemnify Debtor in connection with claims that involve Debtor's management of the Communities. Yet the Plan

proposes to release FP's indemnification obligations. Moreover, the Plan and Support Agreement seek to alter FP's duties to Debtor for FP's benefit at the expense of Debtor's estate and Class II creditors.

55. Second, FP is not contributing substantial assets to Debtor to fund the Plan, it proposes to cover administrative expenses in an unknown amount and up to $45,000 over the life of the Plan to the extent that Debtor (an entity that is intended to run break-even) cannot fund the Plan.

56. Third, Debtor does not benefit from the Plan provisions that aim to prevent indirect suits against FP and Related Entities; instead, the releases proposed in the Plan and Support Agreement are an attempt to shield parties already indebted to Debtor from liability following confirmation of the Plan.

57. Fourth, Class II has voted to reject the Plan, hence there is not overwhelming support for the Plan.

58. As to the fifth and sixth factors, the Plan fails to meet the requirements of confirmation since it is not proposing a payment of all or substantially all of the Class II claims and the Plan does not propose an alternative mechanism to recover in full from FP. Instead, Debtor has created a means for FP and Related Parties to rid themselves of any payment or other obligations to Debtor under the Property Management Agreement, or otherwise, and extract FP from its indemnification duties if it is sued.

59.     Finally, the seventh factor requires the Court to make a record of its factual findings. This is not necessary, as the Plan fails, on its face, to meet six of the *Dow Corning* factors and therefore confirmation of the Plan should be denied.

## **CONCLUSION**

Confirmation of the Plan should be DENIED because the Plan fails to meet the applicable requirements of sections 1191(b) and 1129(a) of the Bankruptcy Code.

Respectfully submitted by:

**TAFT, STETTINIUS & HOLLISTER, LLP**

Dated:  April 10, 2024
/s/ Jay L. Welford
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com
*Attorneys for Champion Home Builders, Inc.*

## EXHIBIT LIST

Exhibit 1 – February 2024 Transcript

Exhibit 2 – Property Management Agreement

Exhibit 3 - Arbitration Award

Exhibit 4 – March 2024 Transcript

Exhibit 5 – Support Agreement

Exhibit 6 – Ballot

Exhibit 7 – Hal Luftig Opinion

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

Residents First, LLC,

    Debtor.

_____/

Case No. 23-49817-mar
Chapter 11
Hon. Mark A. Randon

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 10, 2024, I caused a copy of the *Objection to Debtor Resident's First, LLC's Chapter 11, Subchapter V Plan of Reorganization* and this *Certificate of Service* on all parties who are registered to receive electronic notification via the court's ECF filing system, including the Debtor's counsel, the Chapter 13 trustee and the United States Trustee.

Respectfully submitted by:

**TAFT, STETTINIUS & HOLLISTER, LLP**

Dated: April 10, 2024

/s/ Jay L. Welford
Jay L. Welford (P34471)
Kimberly Ross Clayson (P69804)
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
Phone: (248) 351-3000
jwelford@taftlaw.com
kclayson@taftlaw.com

*Attorneys for Champion Home Builders, Inc.*